Filed 11/18/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ZULMA UNZUETA, | B284305 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC495137) |
| v. | |
| ASMIK AKOPYAN, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Conditionally reversed and remanded with instructions.

McMurray Henriks and Yana G. Henriks for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson, Zena Jacobsen; Packer, O'Leary & Corson, Robert B. Packer and Paul M. Corson for Defendant and Respondent.

_____

Zulma Unzueta appeals from a judgment entered after a jury trial in favor of defendant Asmik Akopyan, M.D., on Unzueta's action for medical malpractice. Dr. Akopyan served as the anesthesiologist during the birth of Unzueta's child, after which Unzueta's right leg was permanently paralyzed. The jury found Dr. Akopyan breached the duty of care she owed Unzueta, but the breach did not cause Unzueta's paralysis. On appeal, Unzueta contends the trial court erred in denying the *Batson/Wheeler*[1] motion the court made sua sponte after Dr. Akopyan's attorney exercised peremptory challenges to six Hispanic prospective jurors out of his seven total challenges. Unzueta argues the court erred in not requiring defense counsel to offer nondiscriminatory reasons for his first four challenges that formed the basis of the trial court's prima facie finding of racial bias. We agree.

We conditionally reverse for the limited purpose of conducting the second and third steps of the *Batson/Wheeler* inquiry as to all six challenged Hispanic jurors. The prohibition against the exercise of peremptory challenges to exclude prospective jurors on the basis of race or other group bias applies to civil as well as criminal cases. We credit the trial court for raising a *Batson/Wheeler* challenge on its own motion. But once the court found a prima facie showing of racial bias as to all six Hispanic prospective jurors, it was required to elicit from Dr. Akopyan's attorney justifications for each of the six prospective jurors, including the four prospective jurors excused the prior day and the two excusals that immediately precipitated the court's sua sponte motion. On remand the court should

_____

[1]     *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

2

require defense counsel to state his reasons for challenging the first four prospective jurors, and the court must decide in light of the record as to all six jurors whether Unzueta has proved purposeful racial discrimination.  If the court finds it cannot adequately perform the second and third stages of the *Batson/Wheeler* analysis on remand because of the passage of time or other reason, or if it determines Dr. Akopyan's attorney exercised the peremptory challenges based on racial bias, it should set the case for a new trial.  If the court finds Dr. Akopyan's attorney exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment.

Unzueta also contends the trial court erred in excluding evidence of Dr. Akopyan's dishonesty in representations she made to obtain her medical license and denying Unzueta's motion to exclude testimony from Dr. Akopyan's expert for failure to designate the witness as an expert.  Further, Unzueta asserts defense counsel's closing argument was improper.  As to these contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Complaint*

On November 6, 2012 Unzueta filed her complaint against Dr. Akopyan, Adventist Health White Memorial Medical Center (White Memorial), and 50 Doe defendants alleging medical malpractice in the delivery of her first child.  Unzueta alleged Dr. Akopyan's negligent administration of an epidural injection resulted in "paralysis of her right leg from the knee down."

3

B.    *Designation and Deposition of Expert Witness Dr. Zakowski*

On August 5, 2014 White Memorial served its designation of expert witnesses on Unzueta. White Memorial designated Mark Zakowski, M.D., and stated, "The general substance of the testimony that this expert witness is expected to give: standard of care, causation and damages."

On March 12, 2015 White Memorial served its second designation of expert witnesses on Unzueta, in which it again designated Dr. Zakowski to testify on the "standard of care, causation and damages." Dr. Akopyan did not include Dr. Zakowski in her expert witness designations. However, Dr. Akopyan reserved "the right to call any expert witness identified by any other party." On July 2, 2015 Unzueta deposed Dr. Zakowski.

Before trial, White Memorial settled with Unzueta and withdrew its designation of Dr. Zakowski. On February 3, 2017 Unzueta filed a motion in limine (No. 3) to exclude Dr. Zakowski's testimony at trial on the basis Dr. Akopyan had failed to designate him as her expert witness. Unzueta also argued Zakowski's testimony was cumulative of the testimony of Dr. Akopyan's designated anesthesiology expert, Dr. Kevin Becker. Dr. Akopyan opposed the motion, arguing she could properly rely on the expert designation by codefendant White Memorial because Unzueta deposed Dr. Zakowski on July 2, 2015. The trial court denied the motion to exclude Dr. Zakowski without prejudice.[2]

---

[2]    Although the trial court's ruling on motion in limine No. 3 is not reflected in the appellate record, Dr. Zakowski was allowed to testify at trial.

4

During trial, Unzueta filed another motion in limine (No. 4) seeking to limit the scope of Dr. Zakowski's testimony by barring testimony as to the standard of care applicable to Dr. Akopyan. Unzueta argued that because Dr. Zakowski was designated as the expert for White Memorial, she deposed him only as to the standard of care applicable to White Memorial's nursing staff, not Dr. Akopyan. Unzueta attached excerpts from her deposition of Dr. Zakowski in which he stated he would not be testifying on the standard of care applicable to Dr. Akopyan. Unzueta in her motion did not seek to preclude Dr. Zakowski's testimony on causation. In the excerpts of Dr. Zakowski's deposition attached to Unzueta's motion, counsel for White Memorial stated, "[H]e does have some opinion as to what caused this injury based on his background, training, education and experience . . . ."

At a hearing on March 1, 2017 during trial, the court clarified it had granted motion in limine No. 4, precluding Dr. Zakowski from testifying about standard of care, but allowing him to testify about causation.

C.    *Unzueta's Offer of Proof Regarding Dr. Akopyan's Criminal Record and Medical License Applications*

On February 8, 2017 Unzueta filed a written "offer of proof," seeking to admit evidence Dr. Akopyan was convicted in 1992 of theft (Pen. Code, § 484, subd. (a)), was arrested but not convicted in 1999 for the same offense, and had concealed her criminal record from the Medical Board of California (Medical Board) in her 1999 application for a medical license and subsequent renewals. Unzueta sought to introduce testimony from Dr. Akopyan about these events; testimony from Dr. Akopyan's husband, Dr. Manvel Michael Mazmanyan, regarding his participation in these events and his criminal

5

conviction and license suspension; certified court records from Drs. Akopyan's and Mazmanyan's criminal cases; and records from the Medical Board regarding the licensure of Drs. Akopyan and Mazmanyan.  Dr. Akopyan opposed introduction of the proposed evidence and requested an opportunity to investigate Unzueta's allegations.  The trial court ordered the Medical Board to produce to the court Dr. Akopyan's medical licensure and renewal applications.

After a hearing, the trial court excluded all evidence of Dr. Akopyan's criminal record and medical license applications. The trial court found, "[T]here's no question she failed to disclose a misdemeanor conviction from 1992.  [¶]  That is extremely remote to the point where I think Evidence Code [section] 352's factor[s] substantially outweigh its probative value."  The court noted 15 years had passed since Dr. Akopyan had last failed to disclose her conviction on her 2002 medical license application. The court reasoned, "At some point, you know, these transgressions have got to fade into black."  The trial court also found Dr. Akopyan had not lied on her medical license renewal applications because the applications asked only whether Dr. Akopyan had "been convicted of any felony or any crime in any state since you last renewed," which she had not.  With respect to the evidence relating to Dr. Mazmanyan's conviction, the court found "the [Evidence Code section] 352 factors with the husband are just overwhelming."

D.    *Testimony at Trial*

1.    *Unzueta's case*

On August 26, 2011 White Memorial admitted Unzueta for the delivery of her baby.  Unzueta testified she was in great pain when she arrived at the hospital to give birth.  Dr. Akopyan

6

administered an anesthetic by epidural injection for the pain. A nurse provided Unzueta with a document to sign providing her informed consent to the epidural anesthesia, but Dr. Akopyan injected Unzueta with the epidural before she signed the document. Dr. Akopyan did not explain the procedure or examine Unzueta. Unzueta would not have consented had she been informed the epidural presented a risk of permanent nerve injury. After the injection, Unzueta immediately began to shake, so nurses brought her a blanket. The anesthetic did not reduce Unzueta's pain, so Dr. Akopyan administered a second epidural injection.

During the final stage of the delivery, the nurses, the baby's father, and the baby's paternal grandmother held Unzueta's legs. Unzueta gave birth to a healthy baby. After the birth, Unzueta was numb in both of her legs. Her left leg regained feeling, but her right leg did not. Unzueta never regained full use of her right foot.

Unzueta presented expert testimony from Drs. Karl Norris, Hyman Gross, and Sherman Shlomo Elspas that Dr. Akopyan's conduct fell below the standard of care and caused Unzueta's injury either by the administration of epinephrine in the epidural injection or by the epidural needle damaging the nerve root through direct contact.[3]

---

[3] Unzueta has not included the testimony of Drs. Norris, Gross, and Elspas in her designated record on appeal, but the parties' closing arguments and the testimony of Dr. Akopyan's experts make clear the principal theories Unzueta's experts relied on to explain the cause of her injury.

## 2. *Dr. Akopyan's case*

Dr. Akopyan testified as to her procedure for administering epidural injections. She acknowledged the first epidural injection she administered to Unzueta was not effective, but explained, "It's a common practice to replace epidurals." Dr. Akopyan opined she could not have damaged the nerve responsible for Unzueta's injury because the damaged nerve was in Unzueta's leg above the knee, whereas the epidural needle was placed in her back. Dr. Akopyan also testified that damage to the nerve in the leg was a "very common complication" for a person who gives birth in the position Unzueta was in.

Dr. Becker, an anesthesiologist, opined Dr. Akopyan's treatment of Unzueta met the standard of care and did not cause Unzueta's injury. He testified anesthesiologists commonly need to administer a second epidural when the first proves unsatisfactory, which is not a sign of medical negligence. Dr. Becker found from his review of Dr. Akopyan's records that she recorded inaccurate blood pressure readings, but the errors did not contribute to Unzueta's injury. He opined the epidural injection administered to Unzueta's back was too far from the damaged nerve in Unzueta's leg to have caused the injury. Further, there was no evidence Dr. Akopyan struck a nerve during the administration of either epidural injection.

Dr. Zakowski, an obstetric anesthesiologist, opined it was reasonably medically probable Unzueta's injury was caused by the force of labor or external compression by the positioning of her legs during the labor and delivery. Further, there was "zero" probability Unzueta's injury was caused by epinephrine contained in a test dose for the epidural placement, and there was "no way physically" for an epidural needle in the lower part of Unzueta's back directly to strike the nerve root located above

8

the knee to cause Unzueta's injury. Dr. Zakowski opined it was not reasonably medically probable Unzueta's injury was caused by the epidural injections.

E.    *Closing Arguments*

During closing arguments, Dr. Akopyan's attorney, Robert Packer, argued Unzueta had failed to prove Dr. Akopyan's care caused Unzueta's injury, arguing it "was the result of a rare but well-described phenomenon of nerve compression, both external and internal, from forces of labor."

Packer continued, "Now, we discussed at length, I believe during our jury selection, opening statements, that in California and the United States, our system of what we call civil justice, as opposed to criminal justice, we don't impose liability. We don't take Dr. Akopyan's purse and give it to Ms. Unzueta . . . ." As he spoke, Packer motioned with his hands as if to move an object from one place to another. Unzueta's attorney, Yana Henriks, made an objection, which the court overruled. Packer continued, "without a proof of fault. We are a fault-based system." Packer went on, "In a civil case for money damages, based upon negligence, professional or otherwise, the plaintiff has to prove that the defendant was at fault, just as a plaintiff who might sue you or you might sue somebody some day in the future has that burden of proof."

With respect to economic damages, Packer argued, "[T]here's no evidence of income loss in this—in the past or reasonably certain to occur in the future." Packer asserted Unzueta's injury did not prevent her from being employed, but "[i]nstead she would like to be supported the rest of her life by Dr. Akopyan at an enormous amount of money. I think the figure was $875,000." Henriks did not object. Packer continued, "From

9

the time of her birth of her baby until today she's been a Medi-Cal recipient . . . . Medi-Cal has paid over . . . [s]ix years, $1200 . . . ." At this point, Henriks made an objection, which the trial court overruled.

F. *Verdict*

The jury returned a special verdict for Dr. Akopyan, finding Dr. Akopyan was "negligent in the care and treatment" of Unzueta, but Dr. Akopyan's negligence was not "a substantial factor in causing harm" to Unzueta.

On April 13, 2017 the trial court entered judgment in favor of Dr. Akopyan.

G. *Unzueta's Motion for New Trial*

Unzueta moved for a new trial based on the trial court's exclusion of evidence of Dr. Akopyan's conviction and misrepresentations to the Medical Board; denial of Unzueta's motion to exclude the testimony of Dr. Zakowski; and Packer's asserted misconduct during closing arguments by referencing Dr. Akopyan's "purse" and stating Unzueta wanted Dr. Akopyan to support her for "the rest of her life." Unzueta also raised issues related to *Batson/Wheeler*, discussed below. After a hearing, the trial court denied the motion. Unzueta timely appealed.

10

**DISCUSSION**

A.   *The Trial Court Erred by Failing To Require Defense Counsel To Justify Excusal of the First Four Hispanic Prospective Jurors*

1.   *The challenged jurors*

Jury selection began on February 6, 2017. The next day Dr. Akopyan's attorney, Packer, exercised four peremptory challenges to excuse prospective jurors R. Medina, J. Quintero, G. Henriquez, and R. Villarreal.

Medina was a civil engineering student, unmarried, without children, with no prior jury experience. She had "indifferent" medical experiences and no experience with childbirth or epidural treatment for pain.

Quintero was a sanitation worker for the City of Los Angeles, was married with four adult children, and was raising one grandchild. He had served on four criminal and one civil juries, all of which reached verdicts. One of his children did not work because of a disability.

Henriquez was a child specialist, married, with no prior jury experience. Her husband was disabled and did not work. Henriquez had a pending workers' compensation case for an injury sustained in a workplace fall. She stated she would be able to distinguish between the standard of negligence at issue in Unzueta's case and the no-fault standard for workers' compensation.

Villareal was a children's social worker who supervised investigative teams responding to reports of child abuse. She had two adult children and no prior jury experience. As a supervisor, Villareal was responsible for deciding based on the social workers' investigations whether to file a petition in juvenile court

11

regarding the child. Villareal had been criticized for decisions she made but strived to act in the best interests of the children.

Unzueta exercised all six of her peremptory challenges; Dr. Akopyan accepted the panel without exercising her final two peremptory challenges. On February 7, 2017 the jury panel was sworn.

On February 8 voir dire continued for the selection of the alternate jurors. Packer exercised three peremptory challenges to excuse prospective jurors D. Winfrey,[4] D. Zaldana, and A. Marquez.

Zaldana was a broadcast engineer, married, with three adult children. He had experience on one civil jury, which reached a verdict. A relative of Zaldana received heart surgery at one of the hospital's other locations, but "had items left in him" as a result of the surgery. Zaldana explained, "I have a doubt about medical practices," but promised to "be as objective as I can be." Zaldana's father had developed symptoms of Parkinson's disease about two months after having an angiogram performed. Zaldana questioned whether the symptoms were brought on by the angiogram test. Zaldana believed medical complications could "arise in any circumstances" without "necessarily [being] the doctor's fault," although it may be "the doctor's responsibility."

Marquez was single and a sales associate at a hardware store, with no prior jury experience. He had previously broken an ankle, which was a painful injury and disrupted his daily living

---

[4]     Unzueta does not contend Winfrey was Hispanic, and therefore we do not discuss her responses or Packer's reasons for excusing her.

12

for three or four months. After the injury, Marquez "sat at home."

After Packer exercised peremptory challenges to excuse Winfrey, Zaldana, and Marquez, the trial court requested all jurors and prospective alternate jurors leave the courtroom so the court could speak with the attorneys.

2. *The trial court's* Batson/Wheeler *motion and ruling*

Outside of the presence of the jury, the trial court stated, "Mr. Packer, the only peremptories you exercised yesterday were against Hispanic jurors. Today you have exercised peremptories against two Hispanic jurors. [¶] I find a prima facie case that you have violated the *Wheeler/Batson* rulings, and you are going to have to justify your peremptories right now." The court continued, "I'm surprised the plaintiffs haven't made a *Wheeler/Batson* challenge, but I would have from what I've seen."

Packer responded as to Marquez, "[T]his is what's in my notes." The trial court noted, "For the record, it looks like just about five lines. [¶] . . . [¶] . . . With just a couple of words on each line . . . ." Packer described his reasons for challenging Marquez: "He's single. He has no jury experience. I didn't know anything about him. Either I didn't get to him closely enough or the plaintiff didn't ask any questions, but he appeared to me to be disinterested in the case. He didn't volunteer anything during the course of questioning of the other jurors, many of whom had a lot of things to say about medicine and about chronic pain, about the things I asked about, the facts that we talked about. I felt that he, at this point, was completely unknown to me compared to the other jurors. That's why I excused him."

The trial court responded, "Very well." Unzueta's attorney, Henriks, interjected, "Your Honor, we did notice yesterday that

13

some very good jurors that . . . could have been very fair were challenged." The court responded, "You didn't make the motion." Henriks explained, "We're very desperate to get our expert and get the panel—and who has a medical condition. So out of that desperation. But we did notice. We didn't think it proper . . . ." Henriks added that "all of [the defense's] challenges" from the previous day were used to excuse jurors "because they're Hispanic" and "[t]here was nothing wrong with them." The court responded, "Well, that water is under the bridge. I'm not going to ask counsel to justify yesterday's peremptories. That is past."

Packer reminded the court the panel as constituted included at least three Hispanic jurors. The court responded that "[o]ne juror improperly challenged justifies the *Wheeler/Batson* motion." However, the court reiterated, "That's yesterday's news. I'm not dealing with it now. Plaintiff, for whatever reason, failed to raise it. But today, based on what happened yesterday and today, that's why I raised it on my own motion."

The trial court did not ask Packer to explain his use of a peremptory strike to excuse Zaldana, and Packer did not provide an explanation. The court denied the *Batson/Wheeler* motion, finding Packer had justified his use of peremptory challenges as to the alternates.

3.      *Unzueta's motion for new trial*

On June 5, 2017 Unzueta moved for a new trial, arguing, among other things, the trial court failed to require Packer to justify the four peremptory challenges he exercised as to the Hispanic jurors on February 7. Unzueta also asserted the court erred by failing to elicit an explanation from Packer for his removal of Zaldana on February 8.

14

At the hearing on the motion, Henriks explained she had not made a *Batson/Wheeler* motion on February 7 because she "wanted to see if [defense counsel was] going to continue the pattern . . . ." Packer stated he challenged Zaldana because of the "history of his father's surgery which he felt was the cause of his father developing Parkinson's disease." Packer explained he was concerned Zaldana "believe[d] that anytime there is an adverse outcome that somebody must have done something wrong." The trial court acknowledged it "didn't question [Packer] thoroughly enough regarding the challenges." The trial court "urge[d] the Court of Appeal to look at this very closely and possibly the Supreme Court, if it gets that far, because this is—I just feel very, very conflicted about what happened." The court took the motion under submission.

As reflected in its July 10, 2017 minute order, the trial court denied Unzueta's motion for a new trial. With respect to Dr. Akopyan's late-proffered explanation for striking Zaldana, the court reasoned, "[I]f a post-trial evaluation is permissible on remand following an appeal, it should be permissible at a hearing on a motion for a new trial, which occurs much more closely in time to the complained-of event." The court explained, "[I]n light of the hearing on [Unzueta's] new trial motion, the court is satisfied that no *Wheeler/Batson* violation occurred. During the hearing which this court initiated, [d]efense counsel pointed to several portions of the reporter's transcript as reasons for exercising a peremptory challenge against [Z]aldana. The [c]ourt is more than satisfied that those reasons are not pretextual." With respect to prospective jurors Medina, Quintero, Henriquez, and Villareal, the trial court found Unzueta had not made "a motion at any time," and "[t]he language on which [Unzueta] relies in the transcript does not rise to the level of a motion." The

15

court continued, "While the delay itself does not defeat the motion, it supports the notion that plaintiff did not actually make a motion at the time she claims she did.  This is regrettable.  It appears that the court struck those four Hispanic jurors without questioning them.  Had [Unzueta] made a proper motion, the court might have ordered defense counsel to justify his strikes and possibly have granted this motion."  The court concluded, "Even though the [c]ourt is denying this [m]otion for a [n]ew [t]rial, the facts are troubling.  We are in need of appellate guidance."

### 4. *Applicable law*

Unzueta, who is Hispanic,[5] contends Dr. Akopyan's exercise of six of her seven peremptory challenges to excuse Hispanic prospective jurors was based on race and deprived Unzueta of her federal constitutional right to equal protection (*Batson, supra*, 476 U.S. at p. 88) and state constitutional right to a trial by a jury drawn from a representative cross-section of the community (*Wheeler, supra*, 22 Cal.3d at pp. 276-277).  Specifically, Unzueta argues the trial court erred in failing to evaluate whether Dr. Akopyan exercised her peremptory challenges as to the first four Hispanic prospective jurors based on their race.

"'[A] party may exercise a peremptory challenge for any permissible reason or no reason at all' [citation] but 'exercising

---

[5]     Dr. Akopyan does not dispute Unzueta and the six prospective jurors are Hispanic.  (See *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1156, fn. 2 ["We have held that Spanish surnames may identify Hispanic individuals, who are members of a cognizable class for purposes of *Batson*/*Wheeler* motions."].)

peremptory challenges solely on the basis of race offends the Fourteenth Amendment's guaranty of the equal protection of the laws' [citations]. Such conduct also 'violates the right to trial by a jury drawn from a representative cross-section of the community under article 1, section 16, of the California Constitution.'" (*People v. Smith* (2018) 4 Cal.5th 1134, 1146 (*Smith*); accord, *People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*) ["Peremptory challenges are 'designed to be used "for any reason, or no reason at all."' [Citations.] But there are limits: Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender."]; *People v. Winbush* (2017) 2 Cal.5th 402, 433 (*Winbush*) ["Both state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on their race or membership in a cognizable group."].) "The "Constitution forbids striking even a single prospective juror for a discriminatory purpose."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 76 (*Hardy*); accord, *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*) ["Exclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error, requiring reversal."].)

The prohibition against the exercise of peremptory challenges to exclude prospective jurors on the basis of race or other group bias applies to civil as well as criminal cases. (*Di Donato v. Santini* (1991) 232 Cal.App.3d 721, 731 ["a party to a civil lawsuit may not use peremptory challenges to exclude women from the jury panel on the basis of their gender"]; accord, *Holley v. J & S Sweeping Co.* (1983) 143 Cal.App.3d 588, 592 [concluding as to *Batson/Wheeler* motion, "[w]e are persuaded that substantially similar constitutional concerns compel a uniform application to civil jury trials"].)

17

A three-step procedure governs the analysis of *Batson/Wheeler* challenges.  (*Smith, supra*, 4 Cal.5th at p. 1147; *Armstrong, supra*, 6 Cal.5th at p. 766; *Winbush, supra*, 2 Cal.5th at p. 433.)  "'First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria,'" such as race.  (*Smith*, at p. 1147; accord, *Hardy, supra*, 5 Cal.5th at p. 75; *Winbush*, at p. 433.)  "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  (*Johnson v. California* (2005) 545 U.S. 162, 170; accord, *People v. Reed* (2018) 4 Cal.5th 989, 999.)  "[A] 'pattern of systematic exclusion' of a particular cognizable group from the venire raises an inference of purposeful discrimination . . . ."  (*People v. Avila* (2006) 38 Cal.4th 491, 549 (*Avila*); accord, *Batson, supra*, 476 U.S. at p. 94 ["Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination.'"].)

"'Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.'"  (*Smith, supra*, 4 Cal.5th at p. 1147; *Winbush, supra*, 2 Cal.5th at p. 433 ["'[I]f the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.'"].)  "[T]he prosecutor 'must provide a "'clear and reasonably specific' explanation of his [or her] 'legitimate reasons' for exercising the challenges."  [Citation.]  "The justification need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice."  [Citation.]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.'"  (*Winbush*, at p. 434; accord, *Hardy,*

*supra*, 5 Cal.5th at p. 76.) "'Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.'" (*Smith*, at p. 1147; accord, *Hardy*, at p. 75; *Gutierrez, supra*, 2 Cal.5th at p. 1158 ["In order to prevail, the movant must show it was "'more likely than not that the challenge was improperly motivated.'"'].) "''The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [moving party].'"'' (*Smith*, at p. 1147; accord, *Winbush*, at p. 433.)

We independently review the legal question whether the trial court was required to elicit justifications for the first four jurors Packer excused. (*People v. Parker* (2017) 2 Cal.5th 1184, 1211 ["'[W]e review the record independently to "apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.'"]; *People v. Harris* (2013) 57 Cal.4th 804, 834 ["Regardless of which standard the trial court used, we independently review the record and apply the standard required by the high court."]; *People v. Edwards* (2013) 57 Cal.4th 658, 698 ["[W]e independently review the record and determine whether it 'supports an inference that the prosecutor excused a juror on the basis of race.'"].)

5. *Unzueta did not forfeit her Batson/Wheeler argument*

Dr. Akopyan contends Unzueta forfeited her *Batson/Wheeler* argument by failing timely to raise an objection to the first four peremptory challenges, and, when she did object, by failing to identify the four jurors, make a prima facie showing, and request the jury panel be discharged. Unzueta argues she joined in the trial court's sua sponte motion by asserting

19

Dr. Akopyan's challenges to the first four prospective jurors were motivated by improper racial bias. Unzueta has the better argument.

As the trial court observed, six of the seven peremptory challenges Packer made were to Hispanic prospective jurors. The court specifically identified all six jurors in finding a prima facie case of discrimination, stating, "[T]he only peremptories [Packer] exercised yesterday were against Hispanic jurors. Today you have exercised peremptories against two Hispanic jurors." Henriks's response—that "yesterday . . . some very good jurors that . . . could have been very fair were challenged," and "all of [the defense's] challenges" were made "because they're Hispanic"—sufficiently identified the challenges she contended were discriminatory (those made "yesterday"), as well as the alleged discriminatory intent (challenges made "because they're Hispanic").

Although Henriks's articulation of Unzueta's *Batson/Wheeler* challenge was not a model of clarity, in contrast to the authorities cited by Dr. Akopyan, Henriks's colloquy with the trial court left no ambiguity as to which peremptory challenges she identified as racially discriminatory and on what basis. (Cf. *People v. Cunningham* (2015) 61 Cal.4th 609, 662 [defendant's objection "'*Batson* again'" was not sufficient to raise *Batson/Wheeler* challenge where record did not reflect "what cognizable class defendant was asserting as the basis" for his motion]; *People v. Booker* (2011) 51 Cal.4th 141, 161-167 [defendant who objected to excusal of four Black prospective jurors under *Batson/Wheeler* on grounds of racial discrimination forfeited argument dismissals were due to impermissible religious discrimination]; *People v. Lewis* (2008) 43 Cal.4th 415, 481 [defendant who challenged excusal of five Black prospective

20

jurors did not sufficiently raise challenge as to Hispanic prospective jurors by identifying one Hispanic juror as being "'the last Spanish that [the prosecutor] kicked out'"], overruled on another ground by *People v. Black* (2014) 58 Cal.4th 912, 920; *People v. Thornton* (2007) 41 Cal.4th 391, 461-462 [defendant forfeited *Batson/Wheeler* challenge to seating of male alternate juror during trial where defendant failed to object to random selection of alternate juror instead of seating sole female alternate juror].)  Because Unzueta sufficiently joined in the trial court's motion, she did not forfeit her argument the trial court's *Batson/Wheeler* analysis was incomplete.[6]

Further, "neither forfeiture nor application of the forfeiture rule is automatic." (*People v. McCullough* (2013) 56 Cal.4th 589, 593 [finding defendant forfeited challenge to imposition of booking fee because failure to raise his ability to pay the fee in the trial court did not raise purely legal issues]; accord, *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["application of the forfeiture rule is not automatic," although "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"].)  As the Supreme Court explained in *S.B.*, the purpose of the forfeiture rule "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*S.B.*, at p. 1293.)  Here, Unzueta identified the peremptory challenges against the first four Hispanic prospective jurors as racially discriminatory, and the trial court addressed Unzueta's contention by finding her objection was untimely, describing the challenges as "water . . .

---

[6]     Dr. Akopyan cites no authority, nor is there any, for her contention a moving party must specifically request the jury panel be discharged.

under the bridge." Therefore, the purpose of the forfeiture rule is satisfied, and we decline to find Unzueta forfeited her argument as to the exclusion of prospective jurors Medina, Quintero, Henriquez, and Villareal.

> 6. *The trial court's* Batson/Wheeler *motion during selection of the alternate jurors was timely as to prospective jurors excused during selection of the jury panel*

Dr. Akopyan alternatively argues any attempt by Unzueta to join the trial court's motion was untimely as to the peremptory challenges exercised the prior day because Unzueta did not raise her objection "at the earliest opportunity during the voir dire process." Unzueta contends her objection was timely because Packer's pattern of systematic exclusion of Hispanic jurors was not fully manifested on February 7. We agree with Unzueta.

"A *Batson/Wheeler* motion is timely if it is made before jury impanelment is completed, which does not occur "'until the *alternates* are selected and sworn.""'" (*People v. Scott* (2015) 61 Cal.4th 363, 383; accord, *People v. McDermott* (2002) 28 Cal.4th 946, 970 ["[T]he defense motion was timely because it was made before the alternate jurors were selected and sworn."].) As the Supreme Court has recognized, "discriminatory motive may become sufficiently apparent to establish a prima facie case only during the selection of alternate jurors, and a motion promptly made before the alternates are sworn, and before any remaining unselected prospective jurors are dismissed, is timely not only as to the prospective jurors challenged during the selection of the alternate jurors but also as to those dismissed during selection of the 12 jurors already sworn." (*McDermott*, at p. 969; see *People v. Gore* (1993) 18 Cal.App.4th 692, 705 ["[T]he

trial court should have considered the motion as to all seven challenged Hispanic prospective jurors and not limited its inquiry to only the alternate juror selection process.  To hold otherwise would be to allow a potential prima facie pattern of systematic exclusion to go unchallenged."].)[7]

While there may have been sufficient evidence to support a prima facie finding of group bias by the time Packer excused the fourth Hispanic juror on February 7, the showing of discriminatory bias was strengthened by Packer's request to excuse two additional Hispanic prospective jurors the following day.  The trial court's motion, raised during the selection of alternate jurors and joined by Unzueta, was timely as to the prospective jurors Packer excused from the panel the day before.

> 7.  *The trial court erred by failing to question defense counsel regarding his peremptory challenges to the first four Hispanic prospective jurors*

Dr. Akopyan argues the four Hispanic prospective jurors challenged on February 7 were not within the scope of the court's sua sponte motion, so the trial court did not err by failing to elicit explanations for why they were excused.  But the trial court's motion identified both the four Hispanic prospective jurors who were excused on February 7 and the two who were excused on February 8.  The court added its motion was "based on what happened yesterday and today."

Contrary to Dr. Akopyan's assertion, the Supreme Court's holding in *Avila, supra*, 38 Cal.4th 491, which addressed the

---

[7]     *People v. Ortega* (1984) 156 Cal.App.3d 63, relied on by Dr. Akopyan, predates the Supreme Court's resolution of this issue in *People v. McDermott, supra*, 28 Cal.4th at page 969.

scope of the trial court's mandatory review on successive *Batson/Wheeler* motions, supports Unzueta's position. There, the defendant objected to the excusal of the first Black prospective juror, but the trial court found the defendant failed to establish a prima facie case of group bias. (*Id.* at pp. 541-542.) When the defendant objected to the excusal of a second Black prospective juror, the trial court found the two excusals constituted a prima facie showing under *Batson/Wheeler*, and it elicited the prosecutor's explanation for excusing the second Black prospective juror, but not the first. (*Id.* at p. 542.)

On appeal, the defendant argued the trial court erred in failing to require the prosecutor to state his reasons for excusing the first Black prospective juror after it found a prima facie case based on excusal of the second prospective Black juror. (*Avila, supra*, 38 Cal.4th at p. 548.) The Supreme Court rejected this contention, explaining the trial court had "no sua sponte duty to revisit earlier *Batson/Wheeler* challenges that it had previously denied," although it had discretion to do so upon request when a subsequent challenge "casts the prosecutor's earlier challenges of the jurors of that same protected class in a new light, such that it gives rise to a prima facie showing of group bias as to those earlier jurors." (*Id.* at p. 552; accord, *Armstrong, supra*, 6 Cal.5th at p. 767 ["Trial courts are no longer obligated to revisit their rulings on earlier *Wheeler/Batson* motions when they conclude the defendant has made out a prima facie case in connection with a later motion."].) The *Avila* court concluded, "[I]f a trial court finds a prima facie showing of group bias at a later point in voir dire, the court need only ask the prosecutor to explain 'each suspect excusal.' [Citation.] Each suspect excusal includes the excusals to which the [moving party] is objecting and which the court has not yet reviewed." (*Avila*, at p. 551.)

Here, Unzueta had not previously challenged the four Hispanic prospective jurors excused on February 7. Thus, because the trial court identified the basis of its sua sponte *Batson/Wheeler* motion as the excusal of all six prospective jurors—not just the two excused on February 8—all six jurors were "suspect excusal[s] . . . which the court ha[d] not yet reviewed." (*Avila, supra*, 38 Cal.4th at p. 551.) Further, as discussed, at the time of the court's sua sponte motion, Henriks specifically raised a concern about Packer's challenges to the first four Hispanic prospective jurors. The fact the challenges were made on separate days is immaterial, as is the fact the challenges were made to both the jury panel and the alternates. (*People v. Scott, supra*, 61 Cal.4th at p. 383; *People v. McDermott, supra*, 28 Cal.4th at p. 969.) Once the trial court found a prima facie showing of group bias, the court was required to elicit from Packer justifications for each of the six challenges forming the basis for the prima facie showing.

> 8. *Conditional reversal and limited remand are appropriate*

Unzueta contends we should remand for a new trial because given the passage of time Dr. Akopyan's attorney will not be able to recall the reasons for excusing the prospective jurors or the appearance and demeanor of the jurors, and the trial court will not have sufficient information on which to conduct a complete *Batson/Wheeler* inquiry. But it is for the trial court to determine in the first instance whether it can conduct a complete *Batson/Wheeler* analysis.

The Supreme Court's decision in *People v. Johnson* (2006) 38 Cal.4th 1096 (*Johnson*) is directly on point. There, after the United States Supreme Court held the trial court erred in finding

25

there was no prima facie case of discrimination, the California Supreme Court on remand considered the appropriate remedy for the constitutional violation. (*Id*. at p. 1099.) The California Supreme Court concluded although jury selection had taken place over seven years earlier, the court and parties could rely on the jury questionnaires and a transcript of the jury selection proceedings, and therefore a limited remand was appropriate for the trial court to conduct the second and third steps of the *Batson/Wheeler* analysis. (*Id*. at pp. 1103-1104; accord, *People v. Scott, supra*, 61 Cal.4th at p. 388 ["[W]hen a trial court erroneously fails to discern an inference of discrimination and terminates the inquiry at that point, an appellate court is generally required to order a remand to allow the parties and the trial court to continue the three-step *Batson/Wheeler* inquiry."].)

In this case, although jury selection took place almost three years ago, as in *Johnson*, there is a transcript of the jury selection proceeding that will assist the trial court and parties in conducting a further *Batson/Wheeler* analysis. In addition, the parties' attorneys may still have their notes from the trial, which Packer referenced during his discussion of the reasons he challenged Marquez. On remand the trial court should require defense counsel to provide Packer's reasons for challenging the first four prospective jurors (Medina, Quintero, Henriquez, and Villarreal),[8] evaluate the explanations, "and decide whether

---

[8] Because remand is necessary for the trial court to conduct a complete *Batson/Wheeler* analysis as to prospective jurors Medina, Quintero, Henriquez, and Villarreal, we do not reach Unzueta's argument the trial court failed to conduct a sufficient third-step analysis of Packer's reasons for excusing Zaldana and Marquez. As part of the third step of the analysis, the trial court will need to make a sincere and reasoned evaluation of Packer's

[Unzueta] has proved purposeful racial discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that [defense counsel] exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds [defense counsel] exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment." (*Johnson, supra*, 38 Cal.4th at pp. 1103-1104.)

B.      *The Trial Court Did Not Err in Allowing Dr. Zakowski To Testify as an Expert Witness*

Unzueta contends the trial court erred by allowing Dr. Zakowski to testify even though Dr. Akopyan did not designate him as an expert witness prior to trial pursuant to Code of Civil Procedure section 2034.300.[9] Dr. Akopyan responds

---

justifications as to all six jurors. (*Gutierrez, supra*, 2 Cal.5th at p. 1159.) In addition, as argued by Unzueta, a comparative juror analysis may be appropriate, which "would ask whether the prosecutor's justification for striking one Hispanic individual applies just as well to an otherwise similarly situated non-Hispanic individual who is permitted to serve on the jury. [A] comparative analysis may be probative of purposeful discrimination at *Batson*'s third stage." (*Id.* at p. 1173; accord, *Winbush, supra*, 2 Cal.5th at p. 442 ["'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor.'"].)

[9]      Code of Civil Procedure section 2034.300 provides in part, "[T]he trial court shall exclude from evidence the expert opinion

27

that because White Memorial designated Dr. Zakowski as an expert and Unzueta deposed him, Dr. Akopyan could call him as an expert witness pursuant to Code of Civil Procedure section 2034.310.  Dr. Akopyan is correct.

Generally, upon a proper objection, "the trial court 'shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed,' inter alia, to designate that expert in its expert witness list."  (*Pina v. County of Los Angeles* (2019) 38 Cal.App.5th 531, 546; accord, *Tesoro del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 641 ["The general rule, set forth in Code of Civil Procedure section 2034.300, is that an undesignated expert witness may not testify."].)  However, Code of Civil Procedure section 2034.310 provides an exception to the general rule, stating "[a] party may call as a witness at trial an expert not previously designated by that party if . . .  [¶]  (a) [t]hat expert has been designated by another party and has thereafter been deposed . . . ."

Dr. Zakowski was designated by White Memorial and was later deposed by Unzueta.  Without citation to the record, Unzueta asserts Dr. Akopyan "elicited expert opinions from [Dr.] Zakowski on subjects not disclosed during his deposition."  But Dr. Zakowski testified at trial only as to the cause of Unzueta's injury, a subject on which White Memorial expressly designated Dr. Zakowski as an expert.  Moreover, White Memorial's attorney

of any witness that is offered by any party who has unreasonably failed to do any of the following:  [¶]  (a) List that witness as an expert under Section 2034.260.  [¶]  (b) Submit an expert witness declaration.  [¶]  (c) Produce reports and writings of expert witnesses under Section 2034.270.  [¶]  (d) Make that expert available for a deposition under Article 3 (commencing with Section 2034.410)."

28

stated at the deposition Dr. Zakowski would opine "as to what caused this injury based on his background, training, education and experience."[10]  Under these circumstances, the trial court did not err in denying Unzueta's motion.

C.    *The Trial Court's Exclusion of Dr. Akopyan's Criminal Record and Medical License Applications Was Harmless*

Unzueta contends the trial court erred by excluding evidence of Dr. Akopyan's 1992 conviction for theft and her applications and renewals to the Medical Board for her medical license, which Unzueta argued showed Dr. Akopyan failed to report her 1992 theft conviction to the Medical Board.[11]  The trial court ruled that under Evidence Code section 352 the evidence

---

[10]    The record on appeal contains only a three-page excerpt from Dr. Zakowski's deposition, which addresses whether Dr. Zakowski would testify at trial as an expert on the standard of care applicable to Dr. Akopyan.  Unzueta did not include any portion of Dr. Zakowski's deposition testimony that shows she lacked the opportunity to question Dr. Zakowski on his opinions as to causation.

[11]    Unzueta also sought to introduce evidence of Dr. Mazmanyan's criminal record, medical license applications, and related proceeding before the Medical Board.  The trial court did not abuse its discretion in excluding that evidence.  The past dishonesty of Dr. Akopyan's husband does not bear on Dr. Akopyan's credibility as a witness, nor was evidence of the Medical Board's action in response to Dr. Mazmanyan's disclosure admissible to show the action it might have taken if Dr. Akopyan had disclosed her prior theft conviction.  (See Evid. Code, § 350 ["No evidence is admissible except relevant evidence."]; *Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 813 ["Only relevant evidence is admissible."].)

was unduly prejudicial because of the length of time that had passed since Dr. Akopyan made a misrepresentation to the Medical Board. We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Trujeque* (2015) 61 Cal.4th 227, 278; *People v. Doolin* (2009) 45 Cal.4th 390, 437.)

"The law provides that any criminal act or other misconduct involving moral turpitude suggests a willingness to lie and is not necessarily irrelevant or inadmissible for impeachment purposes. [Citations.] However, to the extent such misconduct amounts to a misdemeanor or is not criminal in nature, it carries less weight in proving lax moral character and dishonesty than does either an act or conviction involving a felony. [Citations.] Hence, trial courts have broad discretion to exclude impeachment evidence other than felony convictions where such evidence might involve undue time, confusion, or prejudice." (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24; accord, *People v. Doolin, supra*, 45 Cal.4th at p. 443 [Under Evidence Code section 352, "courts may and should consider with particular care whether the admission of [evidence of misdemeanor conduct] might involve undue time, confusion, or prejudice which outweighs its probative value.'"].) Thus, the trial court did not abuse its discretion in excluding evidence of Dr. Akopyan's prior conviction for the purpose of impeaching her credibility as a witness.

However, it is a closer call whether Dr. Akopyan's deception in the procurement of her medical license, even over a decade earlier, should have been admitted to impeach her credibility and competence to provide a medical opinion at trial.[12]

---

[12] Although the trial court correctly pointed out Dr. Akopyan had not lied on her renewal applications because the applications

However, even if the trial court erred in excluding the evidence, Unzueta has the burden on appeal to demonstrate she was prejudiced by the error, "and that a different result would have been probable if such error . . . had not occurred or existed." (Code Civ. Proc., § 475; see *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 231 ["[A]n erroneous evidentiary ruling requires reversal only if "'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.'""]; *Linton v. DeSoto Cab Co., Inc.* (2017) 15 Cal.App.5th 1208, 1224 ["Plaintiff has the burden of affirmatively demonstrating prejudice, that is, that the errors have resulted in a miscarriage of justice."]; *Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 724-725 ["'Reversal is justified "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'""].)

It is not reasonably probable the jury would have returned a verdict for Unzueta on the issue of causation if the impeachment evidence had been admitted. Despite Dr. Akopyan's testimony her conduct met the standard of care, the jury found her not credible, concluding she provided negligent care. Further, the proposed impeachment evidence would not have negated the expert testimony of Drs. Becker and Zakowski that it was not reasonably medically probable Dr. Akopyan's conduct caused Unzueta's injury. Both doctors testified the site

---

only asked whether she had "been convicted of any felony or any crime in any state since [she] last renewed," by not disclosing the prior conviction on her renewal applications Dr. Akopyan continued to conceal her conviction from the Medical Board.

of the epidural injection administered to Unzueta's back was too far from the damaged nerve in Unzueta's leg to have caused the injury. Rather, Dr. Zakowski testified it was reasonably medically probable Unzueta's injury was caused by the force of labor or external compression by the positioning of her legs during the labor and delivery.[13]

D.    *Defense Counsel's Statements During Closing Argument Do Not Require Reversal*

Unzueta argues Packer falsely suggested during his closing argument Dr. Akopyan was not insured, and Packer improperly appealed to the jury's sympathies based on the hardship Dr. Akopyan would suffer from a verdict for Unzueta. We conclude Packer's statement and gesture regarding "tak[ing] Dr. Akopyan's purse and giv[ing] it to Ms. Unzueta" was not improper, and Unzueta forfeited her argument as to Packer's statement Unzueta "would like to be supported the rest of her life by Dr. Akopyan" by failing timely to object and request a curative instruction.

---

[13]    We deny Unzueta's January 3, 2019 request for judicial notice of the Medical Board's accusation that Dr. Akopyan engaged in unprofessional conduct and procured her medical license by fraud, deceit, or misrepresentation, because the document is not relevant to disposition of this appeal. (See *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1223, fn. 3 [denying judicial notice as to documents that were not relevant to court's analysis]; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 ["We also may decline to take judicial notice of matters that are not relevant to dispositive issues on appeal."].)

"'"'"The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.  The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.'"'"  [Citations.]  "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.'"  [Citations.] "An attorney is permitted to argue all reasonable inferences from the evidence . . . ."  [Citation.]  "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety."'"  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795 [statements by plaintiffs' attorney in closing argument equating representations by plaintiffs to claims by jurors for pay for days court was not in session was not attorney misconduct]; accord, *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 646.)  However, "'[t]he law, like boxing, prohibits hitting below the belt.  The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury.'"  (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 295; accord, *Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566-568 [concluding defense counsel's six references to the jury's interest as taxpayers in the payment of damages by defendant public transportation authority, more than 10 references to plaintiff's job loss to show his laziness and irresponsibility in violation of pretrial rulings, and comparison of logo on plaintiff's motorcycle to Nazi imagery were "truly egregious, indisputable instances of misconduct"].)

Unzueta's reliance on *Hoffman v. Brandt* (1966) 65 Cal.2d 549 and *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174 is misplaced.  *Hoffman* involved defense counsel's statement during

33

closing argument that a verdict for the plaintiff would put the defendant in a public home for the indigent. (*Hoffman*, at p. 551, fn. 1.) Although the trial court admonished the jury the argument was not evidence, the Supreme Court concluded defense counsel's statement was prejudicial misconduct because it had no relevance to the case, transparently "appeal[ed] to the sympathies of the jury on the basis of the claimed lack of wealth of the defendant," and falsely implied the defendant had no insurance. (*Id.* at pp. 552-555.) Similarly, in *Du Jardin*, defense counsel argued in his closing, "'When a public agency, be it a school or a library or a hospital is held liable for the admittedly negligent conduct of other people, we just have to sit back and start counting the public services that will disappear when we hold a public entity liable for the negligence of other persons.'" (*Du Jardin*, at p. 177.) The Court of Appeal concluded the statement was misconduct because it "improperly sought to convince the jurors that a litany of public services they currently receive would disappear" and "intimated that the [defendant] City had no insurance to cover any damages." (*Id.* at p. 179.)

Here, by contrast, Packer did not state (or suggest) an award of damages would cause financial hardship to Dr. Akopyan, nor did Packer imply Dr. Akopyan was not insured. Rather, Packer's statement and gesture regarding Dr. Akopyan giving Unzueta her purse were made in the context of Packer's argument that liability requires proof of fault.

Unzueta has forfeited her argument of misconduct with respect to Packer's statement Unzueta "would like to be supported the rest of her life by Dr. Akopyan," because Unzueta's attorney failed to object during trial. "'[T]o preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial and the party must also

34

have moved for a mistrial or sought a curative admonition unless the misconduct was so persistent that an admonition would have been inadequate to cure the resulting prejudice.'" (*Bigler-Engler v. Breg, Inc., supra*, 7 Cal.App.5th at p. 295; accord, *Cassim v. Allstate Ins. Co., supra*, 33 Cal.4th at pp. 794-795 ["In addition to objecting, a litigant faced with opposing counsel's misconduct must also 'move for a mistrial or seek a curative admonition' [citation] unless the misconduct is so persistent that an admonition would be inadequate to cure the resulting prejudice [citation]."].)

Henriks did not object to Packer's statement or request a curative instruction. Henriks's later objection to Packer's reference to Unzueta's reliance on Medi-Cal did not raise a concern about Packer's prior statement.

## DISPOSITION

The judgment is conditionally reversed, and the matter is remanded to the trial court to conduct a complete second and third stage *Batson/Wheeler* analysis. On remand, the trial court is to elicit defense counsel's justifications for the peremptory challenges to prospective jurors Medina, Quintero, Henriquez, and Villarreal, then make a sincere and reasoned evaluation of those explanations. If the court finds, because of the passage of time or other reason, it is unable to conduct the evaluation, or if any of the challenges to the six Hispanic prospective jurors were based on racial bias, the court should set the case for a new trial. If the court finds defense counsel's race-neutral explanations are credible and he exercised the six peremptory challenges in a permissible fashion, the court should reinstate the judgment. In

all other respects, we affirm.  Each party is to bear her own costs on appeal.


                                        FEUER, J.

WE CONCUR:


    ZELON, Acting P. J.


    SEGAL, J.